# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | |
|---|---|
| **SHANNON WILLIAMS,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ] |
| | ]   **CV-11-BE-3948-S** |
| **UNITED OF OMAHA LIFE** | ] |
| **INSURANCE COMPANY,** | ] |
| | ] |
| **Defendant** | ] |
| | ] |

## MEMORANDUM OPINION

This ERISA case is before the court on "United of Omaha Life Insurance Company's Motion for Judgment on the Administrative Record" (doc. 26) and the Plaintiff's "Motion for Judgment as a Matter of Law" (doc.28).  These cross motions have received thorough briefing. For the reasons stated in this Memorandum Opinion, the court DENIES United of Omaha's motion for judgment in its favor and GRANTS the Plaintiff's motion for judgment.

## I.  PROCEDURAL BACKGROUND

After stopping work in May of 2007, the Plaintiff, Shannon Williams, made a claim for short-term disability under her employer's group policy of insurance.  United of Omaha approved this claim through the maximum period that the group plan paid.  After exhausting her short-term disability benefits, Williams made a claim for long-term disability benefits.  On September 12, 2007, United of Omaha notified Williams that it approved her claim for long term disability benefits.

1

Because the definition of disability in the relevant group insurance policy changes after twenty-four months, in April of 2009, almost twenty-four months from the date she began receiving disability benefits, United of Omaha notified Williams that the company would begin conducting a review of her claim.

On January 14, 2011, United of Omaha notified Williams that it terminated her benefits effective January 9, 2011. On July 12, 2011, Williams appealed the decision to terminate benefits. On October 13, 2011, United of Omaha notified Williams that it would uphold the decision to terminate her benefits, and confirmed that she had exhausted her administrative remedies. On November 18, 2011, Williams filed the instant suit in this court, representing an appeal of the administrative decision.

## II.  STANDARD OF REVIEW

In *Blankenship v. Metropolitan Life,* the Eleventh Circuit set out the following current analytical approach for judicial review of a plan administrator's benefit decision in an ERISA matter:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the

2

administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

644 F.3d 1350, 1355 (11th Cir. 2011) (citing *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195

(11th Cir. 2010)).

### III.  FACTS

Until May of 2007, Shannon Williams worked as a field auditor at Overland Solutions, Inc., performing physical audits of businesses, including conducting interviews and investigations, and collecting and recording information to be used in a written report provided to worker's compensation insurance carriers.

**Disability** and **Disabled** mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis ...; and

(b) unable to generate Current Earnings which exceed 80% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for two years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation for which You are reasonably fitted by training, education or experience.
***
**Gainful Occupation** means an occupation that by training, education or experience is or can be expected to provide you with Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to

3

work.
***
**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified.

(Doc. 20-3 and 20-4 at 120-121).

Under the "Payment of Claim" section and "Examination" sub-section, the policy provides as follows: "We sometimes require that a claimant be examined by a Physician or vocational rehabilitation expert of our choice.  We will pay for these examinations. We will not require more than a reasonable number of examinations."  (Doc. 20-4 at 22).  The policy does not define "vocational rehabilitation expert" but it defines "Physician" broadly, including within that definition not only a doctor of medicine but also a doctor of osteopathy and podiatry, a chiropractic, a licensed psychologist, and "where required by law, any other licensed practitioner who is acting within the scope of his/her license."  (Doc. 2–4, at 2).

*Short-Term Disability*

Williams's last day of work was May 10, 2007.  She made a claim to United of Omaha for short-term disability benefits based on a variety of conditions, including pain, fatigue, fibromyalgia, arthritis, degenerative disc disease, and other issues.  United of Omaha initially approved this claim for a ten-day period, and later extended the approval to the maximum period payable under the plan, finding that she was entitled to short-term disability benefits under a separate insurance policy beginning May 11, 2007 through August 10, 2007.  No dispute exists that Williams received those disability payments.

As part of this claim, United of Omaha received medical records from three doctors: Dr. Emanuel Odi, Williams's primary care physician, who had treated her for pain and fatigue for

4

many years; Dr. David McLain, a rheumatologist, to whom Dr. Odi referred her in July of 2007;
and Dr. Jack Zaremba, an independent medical examiner with a specialty in internal medicine to
whom United of Omaha referred Williams for a consult.

*Long-Term Disability*

*Initial Evaluation and Finding of Disability for "Regular Occupation"*

In August of 2007, United of Omaha transitioned Williams's claim from that of a short-
term disability claim to a long-term disability claim.  As reflected in the relevant policy provision
set out below, an insured who is unable to perform her "regular occupation" is entitled to receive
a monthly benefit equal to 66% of her base monthly earning for the first twenty-four months of
that disability.

As part of that transition, on August 21, 20007, Williams underwent a psychological
evaluation by Dr. L.M. Coleman, a treating licensed psychologist who provided assistance to her
in coping with fibromyalgia and chronic pain issues. A dispute exists about Dr. Coleman's
conclusions.  United of Omaha characterizes Dr. Coleman's conclusions as finding that Williams
suffered from depression and a somatization[1] disorder.  The report, does list the following under
Axis I for diagnostic impressions: "Major Depressive Disorder, Single Episode, Moderate to
Severe, Secondary to a General Medical Condition, Fibromyalgia. Somatization Disorder, NOS,
associated with General Medical Condition, Fibromyalgia.  However, in the section explaining
the diagnosis, the doctor states as follows:

Personality testing and clinical interview essentially depict aspects of Major

---

[1]  A somatization disorder is a psychiatric condition characterized by attributing different
symptoms to certain diseases in absence of an actual disease and by changing symptoms in the
absence of physical disorders to explain them.

Depressive Disorder, single episode, moderate to severe secondary to general medical condition, and fibromyalgia.  Aspects of a somatization disorder are also suggested *but these appear to be more reactive to objective physical condition with little primary generation of physical symptoms*.  In this regard, the patient is *not* viewed as dealing with any conversion[2] symptoms but rather reaction to *physical malady*.

(Doc. 20-22, at 35) (emphasis added).

 After exhausting her short-term disability benefits, Williams made a claim for long term disability benefits.  For the first twenty-four months of long-term disability, the definition of disability under the United of Omaha policy is tied to her ability to perform her regular job.  In connection with her claim for long-term benefits, United of Omaha arranged for Dr. Jack Zaremba, an internist, to examine her on August 23, 2007.  Dr. Zaremba made the following diagnoses: "Fibromyalgia, acquired, with early morning stiffness, multiple, migratory trigger points, and severe pain, interfering with much of her complex activities of daily living..."; cervical  disc disease with significant pain; lumbar disc disease with moderately severe pain; osteoarthritis, insomnia/sleep disturbance, Grave's disease, headaches, and extreme fatigue.  He concluded that Williams could not return to her previous job as auditor, involving off-site traveling as well as persistent attention to tasks at hand over a few hours.  (Doc. 20-1, at 22).

In addition to Dr. Zaremba's evaluation, United of Omaha also received a note from Williams's treating internist, Dr. Emmanuel Odi, dated July 26, 2007, stating "Ms. Shannon Williams has been diagnosed with Fibromyalgia a disease condition characterized by Chronic Pain and Chronic Fatigue Syndrome.  She continues to have severe pain ... all over her body. She is on multiple medications for pain.  I do not know how long it will take for her to feel well

---

[2] A conversion disorder is an illness with neurologic symptoms that cannot be explained by a medical evaluation.

6

enough to return to work."  The attached records of Dr. Odi were dated 3/19/07; 4/16/07;

4/30/07; 5/4/07; 5/7/07;5/11/07; 5/15/07; and 5/30/07.  They reflected a history of osteoarthritis

in both knees and complaints of persistent, chronic, pain since 2005, the receipt of pain

medication, and frequent block injections of marcaine for pain management as well as time on a

hydro-therapy bed.

On July 17, 2007, Dr. Odi referred Williams to Dr. David McLain, a board-certified

rheumatologist, who is Chief of Rheumatology at Brookwood Hospital, for treatment of her

fibromyalgia and rheumatoid arthritis.  Dr. McLain confirmed those diagnoses.  As to the

fibromyalgia, his examination found that Williams had tenderness at fifteen of the eighteen

tender points, which existed in all four quadrants; for a diagnosis of fibromyalgia, the American

College of Rheumatology requires a minimum of eleven out of eighteen specified tender points

in all four quadrants with chronic pain lasting a minimum of three months.  As to the rheumatoid

arthritis and other auto-immune diseases, Dr. McLain reviewed records from Williams's previous

rheumatologist, Dr. Traylor, that indicated she had a positive antinuclear antibody ("ANA"),

which is positive in certain types of autoimmune disorders, such as rheumatoid arthritis, Lupus,

and Sjogren's syndrome. Dr. McLain's lab work showed positive rheumatoid factors ("RH") that

would be consistent with auto-immune disease.  Lab work also showed that she had strongly

positive thyroid microsomal antibody of 532, much higher than the normal count of less than 35,

indicating that she had another autoimmune disorder called Hashimoto's disorder associated with

fatigue.  The symptoms for these disorders are muscle and joint pain, fatigue, and cognitive

problems with memory, concentration, thinking, and executive function.

Based on this information, United of Omaha determined Williams was disabled under the

7

"own occupation" provisions of the policy and advised Williams of this decision in a letter dated September 12, 2007.  On that same day, the company referred Williams to a law firm to assist her in pursuing Social Security Disability benefits, because the relevant policy provided for reduction in monthly benefits if the claimant receives other income, such as Social Security disability payments.  Williams eventually received Social Security Disability payments with an onset date of May 11, 2007, the same date she stopped working at Overland.  No dispute exists that the company paid her long-term disability benefits from August of 2007 to August of 2009 under the "own occupation" provision.

*"Any Occupation" Review and Finding of Disability*

Based on the policy language, however, the definition of "disabled" under the policy changed at the end of the 24-month period.  That definition reads as follows:

> **Disability** and **Disabled** mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis ...; and
>
> (b) unable to generate Current Earnings which exceed 80% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for two years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation for which You are reasonably fitted by training, education or experience.
> ***
> **Gainful Occupation** means an occupation that by training, education or experience is or can be expected to provide you with Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to work.
> ***
> **Material Duties** means the essential tasks, functions, and operations relating

8

to an occupation that cannot be reasonably omitted or modified.

(Doc. 20-3 and 20-4 at 120-121).

As this policy definition provides, beginning at the end of the two-year period, the company defined disability not by whether Williams could perform her regular occupation but by whether she could perform "all of the Material Duties of any Gainful Occupation." Put another way, the disability standard changed from "own occupation" to "any occupation." Because of this change, as of April of 2009, United of Omaha began reviewing William's claim and work capacity, and continued to pay Williams benefits during the review process.

United of Omaha requested updated records from Dr. McLain on May 4, 2009. The records received reflected that lab tests performed on January 2008 were positive for rheumatoid factors (RF), positive for ANAs and positive for thyroid mycrosomal antibodies. (Doc. 20-17, at 35).

In a physician report dated September 28, 2009, Dr. McLain listed as primary diagnoses rheumatoid arthritis, fibromyalgia, Sjogren's syndrome, Hashimotos thyroiditis with objective findings of ANA positive, positive RF, positive thyroid antibodies, positive anticardiolipin antibody IgM[3] and poor prognosis for recovery. Dr. McLain responded to questions about whether she has restrictions in actions as follows: Lifting/Carrying - yes - 10-15# occasionally; Use of hands in repetitive actions -yes - not repetitive; Use of feet in repetitive movements - yes - but with residual pain; Bending - no; Squatting - no; Crawling - no; Climbing - yes - no ladders; Reaching - no.

---

[3] This antibody is an anti-mitochondrial antibody commonly found in patients with systemic lupus erythematosus and other autoimmune disorders.

On October 6, 2009, United of Omaha requested updated records from Dr. McLain,  and

received them.  In a letter dated October 23, 2009, United of Omaha advised Williams that the

company had determined that she satisfied the "any occupation" definition of disability and

would provide long-term disability benefits to her, but reserved the right for further reviews.

*2010 Review and Change to a Finding of  No Disability*

On January 28, 2010, United of Omaha referred Williams's case for review by one of its

nurse case managers.  On February 5, 2010, the nurse concluded that "Available Medical

Documentation does not appear to support restrictions and limitations to pre[c]lude sitting 6-

hours out of an 8-hour day with the ability to frequently make position changes and occasionally

lifting up to 10 pounds." Under the "Medical Analysis" section of this report, the nurse reviewed

Dr. McLain's medical record of November 24, 2009 and lab work from that month.

As possible recommendations, the nurse stated "Could request most recent more detailed

laboratory results from Dr. McLain that include ANA, RF or sedimentation rate";  "Does the

client see a primary physician that has a more detailed examination?"; "Could request a

Functional Capacity Evaluation of the claimant." Under the "Medical Analysis" section, the

nurse states: "Her vitals signs including blood pressure 120/80 and pulse 80 are not significant of

debilitating pain.  Dr. McLain indicates positive ANA with no available report; File dated

11/04/09 is the most recent laboratory report revealing a normal CBC.  There is no indication of

a current inflammatory response."  (Doc. 20-24, at 31).  Based on this information, the nurse case

manager opined that the available medical documentation did not support the inability to perform

any occupation.

In April of 2010, Dr. McLain performed lab tests on Williams that showed positive ANA

titer (a measure of the amount of ANA in the blood) and a positive thyroid microsomal antibodies.

On May 28, 2010, as a result of the case nurse's recommendations, United of Omaha sent a letter to Williams advising her that the company would be referring her for a Function Capacity Evaluation (FCE). On June 22, 2010, Todd Clem, a physical therapist, performed a functional capacity evaluation on her starting at 8:45 AM and ending at 11:45 AM. Noting her diagnosis of cervical pain and fibromyalgia, he assessed her physical demand level at medium but modified that finding to sedentary based on her other restrictions.

The summary of his findings state in relevant part as follows:

> Williams demonstrated the ability to perform lifting in the medium physical demand level during testing today as demonstrated by her ability to lift 30 pounds floor to waist both occasionally and frequently. The client demonstrated the ability to occasionally lift floor to shoulder, waist to shoulder and carry 30 feet 30 pounds. She demonstrated the ability to frequently lift waist to shoulder 25 pounds and carry 30 feet 30 pounds. She also demonstrated the ability to frequently sit, reach to desk level and perform fingering, handling, simple/firm grasp and fine/gross manipulation. She demonstrated occasional standing, walking, stair and ladder climbing, reaching overhead and floor level, balance, stooping, crouching, crawling and kneeling. The client demonstrated 19 or 27 consistency test measurements and mechanical compensatory motions indicated consistent effort. Although the client demonstrated the ability to lift in the medium physical demand category, due to her frequent sitting and occasional standing, walking and positional tolerance abilities she would be better suited for work in the sendentary [sic] category. *This client's work tolerances would be better determined thorough testing over a 2 day period to gauge the response to testing from day 1 to 2.*

(Doc. 20-13, at 29) (emphasis added).

In a letter to Dr. McLain dated August 2, 2010, United of Omaha summarized the findings of the Functional Capacity Evaluation and attached a copy of it, stated that the company had determined Williams would be able to return to work in a sedentary occupation, and asked

11

whether he agreed with that assessment.  If the doctor disagreed, the company asked him to

respond with "symptoms, physical exam findings, and objective diagnostic tests to support any

restrictions ... and limitations." (Doc. 20-13, at 21-22).  If he agreed, the company provided a

blank signature line at the end of the letter for him to sign and return.  On August 12, 2010, Dr.

McLain did not sign his name to the signature line, but instead, wrote the following note at the

end of the letter:

> I don't agree [with] this assessment.  FCE Testing has not been a reliable
> indicator of work ability, about [what] a person can do on one day after being
> off work is not the same as working day-after-day.

(Doc. 20-13, at 22).  The record does not reflect that Dr. McLain attached additional documents.

In addition to referring Williams for a FCE, on July 20, 2010, the company also referred

her to Liza Torres, a vocational consultant, for a Transitional Skills Analysis ("TSA") to

determine if Williams could perform alternate occupations with her residual functional capacity

from the FCE.  The report noted Williams's diagnosis of rheumatoid arthritis, fibromyalgia,

Hashimoto's thyroiditis, and Sjogren's Syndrome. Listing the restrictions and limitations in

Clem's FCE, the consultant stated: "For the purpose of this evaluation, employment options will

be considered that include exertion demand of characteristics (EDC) that fall within the sedentary

range, as defined by the dictionary of occupational titles, with the above noted [restrictions and

limitations]." (Doc. 20-14, at 34).  Based on those limitations, she concluded that Williams's

"own occupation" of internal auditor and past work as insurance sales agent[4] fell within the

category of light work instead of sedentary; however, she also determined that Williams

---

[4]Although the vocational expert listed this occupation as "L" EDC, which would indicate
it was a "light" exertion level, United of Omaha's denial letter to Williams listed insurance sales
agent as a sedentary exertion level position.

"demonstrates a wide variety of skills, which would be transferable into other occupations" with sedentary exertion demand characteristics such as "claim examiner, audit clerk, claims clerk, and policy-change clerk." (Doc. 20-14, at 35).

After receiving these responses, the company referred Williams's claim to its Medical Director, Dr. Thomas Reeder, who also held the position of Senior Vice President. Dr. Reeder's reviewing report determined that the FCE provided a valid assessment of Williams's work capacity and that a somatization disorder explained her condition. More specifically, he found that Dr. McLain's various diagnoses of rheumatoid arthritis, osteoarthritis, Sjogren's syndrome, thyroid disease, Graves' disease, and fibromyalgia lacked objective evidence to support them. (Doc. 20-24, at 936).

Dr. Reeder's report stated in relevant part as follows:

Analysis:

The Insured has a somatization disorder. Individuals with somatization disorders either consciously or unconsciously attribute symptoms however minor to significant disease. Dr. McLain has supported the diagnosis of rheumatoid arthritis yet she has never had evidence of synovitis (inflammation of the synovial membrane lining certain joints and commonly found in rheumatoid arthritis), joint inflammation, joint destruction, positive rheumatoid factor, or elevated CCP antibodies. [The report also noted no evidence of functional loss and no evidence of a number of conditions such as cognitive dysfunction, active Grave's disease, osteoarthritis, etc.] The diagnosis of fibromyalgia is not clear. This requires assessment of tender points; however, an individual with somatoform disorder who winces at touching her skin would be impossible to assess. Dr. McLain's records typically documented normal physical exams except for tenderness. On 12 occasions between 1/19/07 and 8/12/10, there was no description of abnormal joints or synovitis, gait and station was consistently normal .... Dr. McLein [sic] never documented manual muscle testing, range of motion, and detailed daily activities, or obtained a drug test in his opioid dependent patient who he questioned whether she was drug seeking on 8/25/08.

As opposed to Dr. McLain's records, the Functional Capacity Evaluation provided objective evidence of the Insured's voluntary ability and effort over three hours of testing. The Functional Capacity Evaluation is designed to extrapolate work capacity over a full 8-hour day. The Insured's extreme pain complaints and normal vital signs were not consistent. While she winced with palpation of her back and soft tissues, there is no report that she winced when she had sensory, range of motion, or manual muscle testing. The evaluation documented normal range of motion of all extremities and slight reduction of lumbar range of motion. Manual muscle testing in all extremities was completely normal. There was no evidence of impaired ability to finger, handle, and manipulate with her hands.

(Doc. 20-24, at 15-16). Dr. Reeder recommended obtaining a psychiatric independent medical examination to resolve the issue of chronic psychiatric function.

As a result of Dr. Reeder's recommendation, United of Omaha scheduled Williams's examination on December 17, 2010 by a psychiatrist, Dr. David Lipsig. In his report dated December 21, 2010, Dr. Lipsig stated that Williams did well on most testing, but performed poorly on the digit span recall used to test a person's concentration. He quoted the evaluation of Robert Denney, a PhD, who viewed the results of Williams's psychological testing: "Overall, the scale pattern suggested repression and channeling stress into physical concerns. It did not suggest conscious exaggeration in my opinion. If medical reasons do not exist for her neurologic and general health complaints... then her test results are more consistent with the presence of somatoform disorder."

Dr. Lipsig's diagnosis was that Williams suffered from a pain disorder associated not only with psychological factors but also with a general medical condition, and, although a pain disorder is a type of somatoform disorder, he would have difficulty delineating the proportion to which her symptoms are driven by psychological as opposed to physical causes. He concluded, "As stated above, in my opinion, there was not sufficient evidence that malingering was a

14

significant factor in this evaluation. Therefore, regardless of the etiology, Ms. Williams perceives that her symptoms have led to severe limitations in her life."  Dr. Lipsig opined that insufficient evidence existed to support any global psychiatric or psychological impairments.  (Doc. 20-11, at 17).  Throughout his report, Dr. Lipsig repeated two opinions: that her pain disorder had associations not only with psychological matters but also with her general physical condition and that she was not consciously exaggerating or malingering to any significant extent.

In December of 2010, the company asked Sadie Burr, Mental Health Coordinator and Licensed Mental Health Practitioner, to review Dr. Lipsig's report.  In her opinion, insufficient evidence existed "that Williams lacked ability to maintain focus and concentration as the result of a psychiatric condition," and, therefore, "insufficient evidence [existed] that Ms. Williams had restrictions or limitations due to a psychiatric condition."  (Doc. 20-24, at 7).  After Burr's opinion, the company received further records from Williams, and United of Omaha sent these additional records to Dr. Lipsig. Because the additional records "predominantly focused on Ms.Williams' *physical* symptoms and treatment," Dr. Lipsig concluded that the additional records did not change his opinion regarding her *psychiatric condition's* effect on restrictions and limitations.

On January 14, 2011, United of Omaha notified Williams that it was terminating her benefits effective January 9, 2011 because "the medical documentation fails to substantiate a condition or conditions that would render [her] totally disabled from any gainful occupation," and thus, she "no longer satisf[ies] the definition of Disability and Disabled."  (Doc. 20-10, at 39-40).  The letter focused on the FCE by Todd Clem demonstrating work abilities as well as the existence of a somatoform disorder diagnosed by Dr. Coleman in 2007, which was consistent

15

with the findings of Dr. Lipsig.  It noted Dr. McLain's disagreement with the FCE but also noted

his failure to provide additional medical documentation supporting his disagreement.  It further

noted that the recent November 2009 doctor records the company had received reflected no

objective support for pain, such as current inflammatory response, joint swelling, range of

motion limitations, MRI and x-rays showing changes, vital signs reflecting debilitating pain.

Further, the November 2009 records from Dr. McLain referenced a lab report showing Williams

had a positive Antinuclear Antibody Test but included no attached lab report confirming Dr.

McLain's statement.  The denial letter listed another gainful occupation, insurance sales agent, as

falling within the sedentary category of work with limitations and restrictions her consultants

established, and also as meeting the necessary gainful wage of 60% of her pre-disability wages.

(Doc. 20-10, at 35-40). [5]

On March 1, 2011, Williams's former employer, Overland Solutions, cancelled its group

coverage with United of Omaha.

*Administrative Appeal*

On July 11, 2011, Williams appealed the decision to terminate her benefits. To support

that appeal, Williams submitted the following additional evidence:

- (1) updated records from Dr. McLain.  Dr. McLain's records reflect that lab tests dated January 2008, April 2010, October 2010, and February 2011 were positive for rheumatoid factors, positive for ANAs, and positive for thyroid microsomal antibodies.

- (2) a 30-page sworn statement from Dr. McLain, testifying, among other things, that Williams met the American College of Rheumatology criteria for fibromyalgia with 15 of 18 tender points in all four quadrants with objective criteria such as x-rays, lab tests with

---

[5] As discussed later in this opinion, Liza Torres had actually listed the occupation of insurance sales agent, a job Williams had held in the past, as falling in the "light" work category, not sedentary; Torres's report did not support this statement.

positive ANA since 2006, and three separate positive RF factors.  Because of these and other findings such as positive thyroid microsomal antibody of 532, Dr. McLain also gave Williams diagnoses of degenerative disc disease and other auto-immune diseases: Hashimoto's syndrome, Sjogren's, osteoarthritis, and rheumatoid arthritis.  He testified that her complaints of pain at an 8/10 level would be consistent with her underlying medical problems, and her underlying medical conditions could reasonably be expected to cause serious distraction from job tasks or result in a failure to complete job tasks on more than an occasional basis during the workday. (Doc. 20-7, at 18).  Further, he testified that jobs requiring her to sit for long periods would increase her pain as would sitting, walking, and standing for a period of eight hours without an opportunity to recline.  He also testified that a job requiring her to use her hands for fingering and grasping for more than a third of the workday would increase her pain because of rheumatoid arthritis. (Doc. 20-7, at 19-20).  Finally, he testified that he agreed with Bledsoe's critique of the FCE report.  Regarding Williams's treatment, Dr. McLain explained that he placed Williams on tumor necrosis factor ("TNF") medication for her rheumatoid arthritis symptoms that tends to help the pain associated with rheumatoid arthritis but not fibromyalgia-associated pain; however, stress and activity trigger flare-ups with rheumatoid arthritis even with TNF medication, and an RA patient's pain varies from day to day.  Williams also takes the following medication: Simponi, Plaquenil (which helps Sjogren's but is not as effective for rheumatoid arthritis); Arava, and Lefluonmide.  This regimen has helped her joints on some days, but has not decreased the tender points for her fibromyalgia.

- (3) Analysis by occupational therapist David Bledsoe of the FCE report, criticizing the report because the testing on which it is based did not extend over two days, and because other problems existed such as internal inconsistencies. Further, Bledsoe criticized the FCE review finding significant that pain complaints were not accompanied by elevated pulse, blood pressure, and respirations when research reflects that no relationship exists between pain and vital signs. (Doc. 20-8, at 25).

- (4) Report of John Long, a vocational rehabilitation expert, reviewing Dr. McLain's sworn statement, and opining that sedentary work would increase Williams's pain to the level she would be unable to timely complete job tasks and that "Williams would not be able to maintain the persistence and pace or [to maintain] adequate attendance necessary for competitive employment even [in] sedentary work activity."  (Doc. 20-9, at 31).

After receiving these additional documents, United of Omaha sent Williams's records to an independent physician board certified in family medicine and rheumatology, Dr. Anne MacGuire, to review the documents for an opinion, but not to examine Williams.  After review, in response to the company's questions, Dr. MacGuire found that the documents supported the

existence of the following medical conditions: osteoarthritis of cervical and lumbar spine; rheumatoid arthritis; fibromyalgia; obesity; autoimmune thyroiditis; and multiple somatic complaints. She found that the level of pain about which Williams complained was inconsistent with the lack of inflammatory markers, lack of radiology studies, and the doctor's notation that the joints looked good.  Further, she found that Dr. McLain's restrictions and limitations were overly restrictive and appeared to be based on Williams's subjective complaints rather than objective medical evidence.  Further, she found that Dr. McLain's restrictions contradicted general rheumatological recommendations that patients "increase activity to promote ability to maintain functional activity and to encourage conditioning."  (Doc. 20-29, at 6-10).

Dr. MacGuire also found that Clem's FCE was not restrictive enough.  Whereas Clem's FCE had found that Williams could occasionally climb ladders, crouch, crawl and kneel, MacGuire found that she could not climb ladders, squat, twist, or stoop.  Clem had found that she could frequently perform "fingering, handling, simple/firm grasp and fine/gross manipulation" but MacGuire found that she "should not complete any activities that require more than 10 pounds of repetitive hand gripping or grasping more than once an hour."  (Docs. 20-13, at 29; 20-29, at 9).  However, Dr. MacGuire specifically found that no evidence existed of "symptom magnification, exaggeration or secondary gain."  (Doc. 20-29, at 9-10).

On October 13, 2011, after receiving Dr. MacGuire's report, United of Omaha notified Williams that the company was upholding the decision to terminate her benefits. That letter referred to Clem's FCE and also listed Dr. MacGuire's findings of limitations and restrictions that conflicted with Clem's findings.  The letter stated that Dr. MacGuire's "restrictions would not preclude sedentary work" but did not refer to any opinion of a vocational expert confirming

18

that statement; rather, the letter referred to the opinion of a transitional skills analysis that was based on Clem's FCE.

After exhausting her administrative remedies, Williams filed suit in this court on November 18, 2011.

## IV.  ANALYSIS

### A. *De Novo* Review

In step one of this court's analytical approach, the court must apply the *de novo* standard to determine whether the claim administrator's benefits denial decision is wrong.  The court finds that the denial decision is *de novo* wrong for several reasons.

At the outset, the court finds that the records and testimony of Williams's treating physician, Dr. McLain, the Chief of Rheumatology at Brookwood Hospital, provided sufficient evidence supporting his diagnoses of fibromyalgia, rheumatoid arthritis, osteoarthritis, Sjogren's syndrome, and thyroid disease.  Fibromyalgia is a disease like chronic fatigue syndrome with subjective symptoms such as pain generalized all over the body, fatigue, stiffness, disturbed sleep, and multiple tender spots; the symptom that distinguishes fibromyalgia from other rheumatic diseases is the existence of tender spots in 18 fixed locations located throughout all four quadrants of the body that cause a patient to flinch when pressed firmly.  *See Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996).  If the court were to require objective facts such as lab tests or an xray to support a diagnosis, no patient would ever be disabled based on fibromyalgia.  However, Dr. McLain's medical records and testimony support finding that Williams meets the American College of Rheumatology criteria for fibromyalgia, noting wincing and tenderness at 15 of the 18 tender point areas in all four quadrants with a history of chronic, diffuse pain lasting

19

more than three months.

Further, lab tests measuring ANA and RF factors provide objective medical evidence supporting the diagnoses of Dr. McLain and other examining physicians, and those for other auto-immune conditions.  All medical experts – other than medical director Reeder – agree that objective documentary support exists for those conditions; they simply disagree about whether Williams can work despite those conditions.

The court notes that some of the doctors acknowledging medical support for those conditions are the *independent medical doctors that United of Omaha hired.*  For example, Dr. Zaremba, an independent ME, confirmed in 2007 the diagnoses of Williams's fibromyalgia with "severe pain, interfering with much of her complex activities of daily living"; degenerative disc disease; lumbar disc disease; osteoarthritis; etc.  (Doc. 21-1, at 22).  As another example, Dr. MacGuire, an independent reviewing rheumatologist, found in 2011 that the documents she reviewed supported the conditions of osteoarthritis of the cervical and lumbar spine; rheumatoid arthritis; fibromyalgia; obesity, autoimmune thyroiditis, as well as somatic complaints.

In light of this consensus of treating and independent medical personnel, the court finds troubling the contrary position of United of Omaha's in-house doctor, who is not a rheumatologist but who takes the rather extraordinary position that *no objective evidence supports* any of these conditions.  In any event, accepting the near-consensus of medical authority, the court begins its analysis acknowledging that Williams suffers from a fairly long list of serious, chronic, documented medical conditions.

Given the existence of those medical conditions, the true issue is not whether she has medical conditions but whether those conditions prevent her from performing any work.  In

October of 2009, the company initially accepted that testimony and found that she was disabled from "any occupation." If United of Omaha had continued to accept that testimony, it must continue to find her disabled from any work. In January of 2011, it changed its mind. The court finds, on *de novo* review for the reasons stated below, that the company was right the first time and wrong to change its mind and that Williams is incapable of working full time at "any occupation."

Having found that Williams suffers from fibromyalgia, rheumatoid arthritis and other conditions that cause chronic pain, and because of the subjective, chronic nature of fibromyalgia, and the existence of good days and bad days, the court must examine the record to determine the overall pattern of her illness and resulting pain, not only on her abilities on a particular day, but on her employability. The court turns first to Williams's statements about the amount of pain she suffers. Williams complains of intense pain all over her body to the extent that the following cause pain: wearing clothes, such as a bra; showering; walking; and contact with others, such as a hug or handshake. (Doc. 20-17, at 7; 20-18, at 6). According to Williams, the pain is so strong and regular that it also interferes with her ability to think and concentrate. (Doc. 20-17, at 10). Williams has characterized her pain with activity as regularly eight and nine out of ten. (Doc. 20-2, at 9, Doc. 20-29, at 9; Doc. 20-11, at 11).

The medical records of Williams's treating physicians support her claims of intense pain. While the Supreme Court held that ERISA administrators are not required to defer to treating physicians over reviewing physicians, the district court handling ERISA appeals may evaluate the weight of each doctor's opinion based on the extent of the patient treatment history, the doctor's specialization or lack thereof, etc. *See Black & Decker Disability Plan v. Nord,* 538

U.S. 822, 832 (2003).

For a conditions as subjective and variable as fibromyalgia and rheumatoid arthritis, direct contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities.  Therefore, in the instant case, the court will focus heavily on the opinions and treatment records of Williams's treating physicians such as Dr. Odi and Dr. McLain.  The records of treating physician Dr. Odi characterized her pain as "severe" and "all over her body"  requiring repeated pain blocks and pain medication without consistent relief from pain.  (Doc. 20-2, at 43).

The records of treating physician Dr. McLain are particularly helpful, as he not only had the opportunity to treat Williams over a period of time and to note the patterns of her diseases, but he also specializes in rheumatology.  His medical opinion is that Williams's pain is disabling, that she is not exaggerating her complaints or malingering, that her complaints of regular pain on a level eight out of ten were consistent with her medical conditions, and that her pain could reasonably be expected either to cause serious distraction from job tasks or to cause her to fail to complete job tasks on more than an occasional basis.

Although the court is not required to give great weight to Williams's treating physicians, the court finds that this evidence is entitled to receive great weight, especially the opinion of her rheumatologist, who has experience in the area of her diseases and a valuable perspective on the relative severity of Williams's case.

Further, the court turns to the evidence of examining physicians.  Without exception, the examining physicians found no evidence that Williams was exaggerating her symptoms, including pain, to a significant degree, or that she was a malingerer.  *See* Adm. Record re Dr.

Coleman at Doc. 20-22, at 35 (stating that "[a]spects of a somatization disorder are also suggested but these appear to be more reactive to *objective physical condition*," so he concludes that the better view is that Williams's claims of pain are a "reaction to a true physical malady") (emphasis supplied); Dr. Lipsig at Doc. 20-11, at 14-16 (stating that test results "did not suggest conscious exaggeration in my opinion...malingering was not a significant issue with this evaluation, [and] it would be very difficult to delineate the proportion to which Ms. Williams' pain symptoms were driven by psychological as opposed to physical etiologies").  *See also* Dr. Zaremba at Doc. 20-23, at 20 (who does not address exaggeration and malingering but accepts her complaints of "severe" and "significant" pain).

In sum, this evidence consistently demonstrates that Williams suffers from a number of serious, chronic conditions, including fibromyalgia, rheumatoid arthritis, and osteoarthritis of the cervical and lumbar spine.  She rates her regular pain level at approximately eight on a ten-point scale, and her treating rheumatologist, who deserves great weight, confirms that pain scale. No examining physician has opined that she is a malingerer or exaggerates her pain to a significant degree.  Further, her treating physician opines that this level of pain would cause her to be seriously distracted from work or be unable to complete tasks.  Because regular pain to that degree would prevent Williams from working full time at "any occupation," the court finds that she is disabled from "any occupation."

The physical therapist's evaluation, finding that Williams is capable of performing certain sedentary work, does not change this finding. The evaluation, while providing information regarding what physical functions Williams could perform for three hours on a particular day, is not determinative of Williams's work capacity; even the evaluator acknowledged that, given

23

Williams's fibromyalgia, a more accurate evaluation of her work tolerances would require a two-day evaluation to gauge her response on day two to the effects of day one testing, but no two-day testing was performed.  And even a two-day evaluation would not necessarily accurately measure the level of pain she suffers or the amount the pain affects her judgment and distracts her from her tasks.  Further, the evaluation did not take into account the variability in her functions depending upon whether she is experiencing a good day or a bad day in the fluctuations that naturally occur in her diseases.  The evaluation is only an accurate measurement of her physical ability during those three hours of that particular day, and can be misleading in a case where the underlying physical condition is fibromyalgia and rheumatoid arthritis conditions causing significant pain. For all of these reasons, the physical capacity evaluation of Clem is entitled to little weight as to Williams's general work capacity.

To the extent that the opinion of rheumatologist Dr. MacGuire varies from Dr. McLean's opinion, the court finds that Williams's treating physician is a rheumatologist who has much more extensive experience with Williams's condition, and Dr. McLean's opinion is entitled to greater weight.  Further, the court finds that internal inconsistencies exist in Dr. MacGuire's report; she finds that Williams is not exaggerating or malingering and yet finds that her complaint of pain measuring eight to nine out of ten is not credible.

Finally, the court finds that the opinion of in-house physician, Dr. Reeder, is entitled to little weight.  Out of the many doctors who have treated and examined Williams or reviewed her medical records, Reeder, who only reviewed her records, stands alone in opining that no objective evidence exists to support the medical diagnoses.  Reeder is not an examining physician or a rheumatologist, and yet, he disagreed with a treating rheumatologist's opinion in

the area of the rheumatologist's expertise, and disagreed as well with the opinions of other examining specialists.  Reeder also ignored or overlooked strong objective evidence in the record, such as repeated references in the medical records to the lab work showing positive RH factors and positive ANA factors, etc.  Given the wealth of evidence by treating and examining specialists supporting the existence of Williams's disability, Reeder's opinion calls into question his credibility and fairness.  The court gives little weight to the opinion of the in-house nurse case manager for the same reasons.

For all of the above reasons, the court FINDS, on *de novo* review, that United of Omaha was wrong to change its determination from "disabled" to "not disabled."

### B. Discretion

If the administrator's decision in fact is "de novo wrong," then the court must determine whether the administrator was vested with discretion in reviewing claims.  The long-term policy in question provides that United of Omaha has "the discretion and final authority to construe and interpret the Policy" and "to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy."  (Doc. 20-3, at 101).

No party disputes that United of Omaha had such discretion.

### C.  Deferential Arbitrary & Capricious Standard

Having determined that United of Omaha's decision is "de novo wrong" and it was vested with discretion in reviewing claims, the court must next determine whether "reasonable" grounds supported the decision; or, put another way, the court reviews the decision under the more deferential arbitrary and capricious standard.  No party disputes that this standard applies.

In making this determination, the court notes that the administrative record is over a

thousand pages with records from a rather extensive list of "experts" to whom United Omaha sent Williams for examination or her records for review: an in-house medical examiner, a psychiatrist, a rheumatologist, a physical therapist, a certified rehabilitation counselor, a licensed mental health practitioner and a nurse.  Extensive referrals and a bundle of paperwork are not necessarily indicative of reasonableness or unreasonableness on the part of the company.  The paper trail could well represent a good company wanting to be thorough and to make a reasonable, well-informed decision.  But, it could also represent a company's less admirable wish to stop paying expensive but appropriate disability benefits and a commitment to keep hiring experts until it could cobble together the right opinions to appear to justify an unreasonable denial of benefits.

To determine which scenario the instant case represents, the court first looks to the reasons the company gave for changing its mind and  rejecting the evidence presented by Williams in support of her disability.

*The Inappropriate Focus on the Label of "Somatization Disorder"*

One reason given for rejecting Williams's disability claim is the evidence in the record Williams has somatic conditions, and herein lies the rub.  United of Omaha focuses on the words "somatoform" and "somatization disorder" with an indelible jumbo marker emphasis that is misplaced.  Sometimes those terms can be catch phrases to denote pain that is "all in the patient's head."  The court notes that because fibromyalgia is a disease with subjective symptoms, conscientious doctors addressing the disease would naturally raise the issue of whether a physical cause exists for the patient's complaints.  The fact that they raise the issue does not in and of itself provide evidence that the patient has no disease or is a malingerer, and, indeed, if they did

not raise this issue, their conscientiousness would be called into question.  Thus, the key is not *whether* the doctors raised the issue, but *how* they resolved the issue.

In Williams's case, even the examining physicians who raised the issue of a somatization disorder consistently concluded that her pain is associated with underlying *physical* conditions and that Williams is not exaggerating her symptoms to any significant degree.

For example, the company's January 2011 denial letter refers back to the 2007 opinion of Dr. Coleman and his reference to a somatization disorder.  A careful reading of Dr. Coleman's opinion, however, does not support any view that Williams's pain is all in her head.  Dr. Coleman states that "[a]spects of a somatization disorder are also suggested but these appear to be more reactive to *objective physical condition*." So he concludes that the better view is that Williams's claims of pain are a reaction to a true physical malady.  (Doc. 20-22, at 35) (emphasis added).  Significantly, the company had Dr. Coleman's report, with its reference to "[a]spects of a somatization disorder," *before* it made its initial determination that she was disabled from any occupation.

When a company changes its mind on a question of permanent disability, the court would expect that change to be based on new information or a significant change in the employee's health and function.  Because the company had Dr. Coleman's report before the change, the reliance on a term taken out of context in an old report to support a change in the disability decision could be an indication of arbitrariness, particularly when a careful reading of the opinion in that report supports instead of rejects Williams's claims of real maladies resulting in real pain.

The denial letter does refer to new medical information from an independent psychiatrist, Dr. Lipsig, that "was consistent" with Dr. Coleman's diagnosis of a somatoform disorder.  While

both doctors' reports were consistent and did refer to a somatoform disorder, both *consistently* conclude that Williams's pain appears to have an underlying physical cause and neither characterizes Williams as a malingerer.  Thus, to the extent the company implies that the doctors' reference to somatoform disorder means that she is exaggerating her pain or that her "phantom pain" has no physical cause, that implication is a mischaracterization of the reports.

Tellingly, the denial letter ignores Dr. Lipsig's findings that Williams is not a malingerer exaggerating her pain.  Rather, it picks and chooses the parts of his report that would seem to support a view of somatic complaints without an underlying physical basis, including the following statement about Dr. Lipsig's report: "Dr. Lipsig indicated that if medical reasons do not exist for your neurologic and general health complaints, then the test results were more consistent with the presence of a somatoform disorder."  (Doc. 20-10, at 39).  The company's choice to highlight that language from Dr. Lipsig's report is disturbing because it implies that Dr. Lipsig found that medical reasons do not exist for Williams's complaints.  But those words, while in Dr. Lipsig's report, were actually the words of testing PhD Robert Denney quoted by Lipsig.  What Denney – who is not a medical doctor and who is merely interpreting a personality test – is saying is that he is just the test scorer, and he cannot know whether medical reasons exist for Williams's complaints.  So, Denney says, *if* underlying medical reasons do not exist, then the testing is consistent with a somatoform disorder.  Dr. Coleman – who is a psychologist, not a medical doctor – said the same thing in his report.  But the denial letter's implication that Doctors Coleman and Lipsig found Williams's pain was not severe and was not associated with a real physical conditions is misleading at best.

The key "take-away" on the "somatoform condition" issue is that nothing truly changed

from the time the company initially found Williams's condition totally disabling.  Dr. Coleman's report predated the finding of "any occupation" disability. And Dr. Lipsig's report did not represent a material change: he merely confirmed that she had a pain disorder associated with *both* psychological and *a general medical condition*, and that she was not exaggerating her pain. If no true change in Williams's condition or documentation of her condition occurred after the finding of disability, then the company's change in position and focus on the term "somatoform condition" would appear to be unreasonable.  And, if the *new* information that United of Omaha received from an independent physician between the time it found disability and rejected disability *confirms* that Williams is *not* a malingerer or exaggerator and *acknowledges* that the doctor cannot establish a line between physical and psychological causes of pain, then the company has little examining physician support for its new position.

Dr. Lipsig was the only new *examining* doctor that United of Omaha consulted in reviewing the disability determination on Williams, but two other doctors looked at her records as part of the company's review: its in-house medical examiner, Dr. Reeder, and an independent rheumatogist, Dr. MacGuire.  Because these physicians were not examining physicians, the court need not spill as much ink about their analyses.  Dr. MacGuire does not question that Williams has the chronic conditions, although she questions how they affect her work capacity, nor does she find evidence of "symptom magnification, exaggeration, or secondary gain." (Doc. 20-29, at 10).

Dr. Reeder, on the other hand, the in-house medical director, focuses primarily on the diagnosis of "somatization disorder" as explaining Williams's health condition and as a basis for questioning her disability from work.  Rather than conduct an in-dept analysis of all of the

aspects of Dr. Reeder's opinion that the court finds troubling, the court will simply list them: (1) Dr. Reeder's insistence that evidence did not support any of Williams's medical conditions despite the fact that every single one of Williams's examining physicians – even those hired by United of Omaha – found that she had those medical conditions; (2) Dr. Reeder's finding that the FCE is a valid assessment even though the evaluator himself questioned its validity, as further discussed below; (3) Dr. Reeder's statement that no evidence exists of rheumatoid arthritis or a positive rheumatoid factor when Dr. McLain's records reflect that lab tests performed on January 30, 2008, May 4, 2009, April 27, 2010, October 26, 2010, and February 2, 2011 were positive for rheumatoid factors, and/or showed abnormal ANA profile results, and at least one of these lab reports occurred before Reeder's report[6].  (Doc. 20-17, at 35; 20-9 at 19, 20-21 & 24); and (4) Dr. Reeder's refusal to accept a diagnosis of fibromyalgia and rheumatoid arthritis when her conditions meet the criteria of the American College of Rheumatology as determined by a licensed rheumatologist.

For all of these reasons, the court finds that United of Omaha unreasonably ignored the objective medical evidence of debilitating diseases or minimized the real physical maladies from which Williams suffered,  in labeling her condition as a somatization disorder and using that label as a justification for finding that she was not disabled.  All examining physicians – even those United of Omaha hired – found that she suffered from fibromyalgia and other rheumatoid-based conditions, and all examining physicians as well as the rheumatologist hired by United of Omaha agreed that she was not a malingerer exaggerating her pain.  With this consensus, United

---

[6]  Dr. Reeder's report is dated September 24, 2010.  The record reflects that he did not have all of  Dr. McLain's lab reports that pre-dated his report, but he certainly could have obtained them, and the company eventually did obtain them but did not reevaluate its decision.

of Omaha's decision to change its position from disabled to not disabled was unreasonable.

*The Misplaced Reliance on the FCE*

Another reason that United of Omaha rejected Williams's claim to disability is the June 2010  evaluation by physical therapist Clem.  While this testing demonstrated that Williams was able to perform certain physical functions during a particular three-hour period on a single day, Clem, who performed the testing, specifically questioned the reliability of such short-term testing as a gauge of her work tolerances. He specifically advised: "This client's work tolerances would be better determined through testing over a 2 day period to gauge the response to testing from day 1 to 2."  (Doc. 20-13, at 29).

When the evaluator himself questions the validity of his evaluation, the company ought to listen.  But United of Omaha ignored that statement. It also ignored Dr. McLain's opinion that Clem's evaluation was not a true measure of Williams's work ability; he explained that what "a person can do on one day after being off work is not the same as working day-after-day." (Doc. 20-13, at 22).

If, after Clem's caveat and Dr. McLain's response, United of Omaha had proceeded to order a multi-day functional capacity evaluation of Williams, the court would be more inclined to accept its efforts and evaluation as complete, reliable, and fair.  Its failure to do so when both the FCE evaluator and the treating physician pointed to that need is troubling.  That failure raises red flags as to the reliability and correctness of the FCE; when red flags are raised and ignored, the specter of unfairness and unreasonableness raises its ugly head as well.

The court also notes the nature of the conditions from which Williams suffered makes a one-time evaluation and the snapshot it provides particularly unrevealing.   Accordingly, United

31

of Omaha's focus on this unreliable FCE is misplaced and unreasonable, unless the company has other reliable evidence that supports and confirms it.  Yet, United of Omaha and other "experts" used the FCE as a basis of its decisions.  The certified rehabilitation counselor used Clem's findings when making the transferable skills analysis.  Dr. Reeder, the in-house medical reviewer, relied on the "objective" evidence of the FCE to reject Dr. McLain's findings, which Reeder claimed were not based on objective evidence.  Further, the denial letter sent to Williams in January of 2011 relied heavily on the FCE and even the October 13, 2011 upholding the decision referred to the FCE.

The court acknowledges Williams's argument that the policy specifically provided for examination by a "Physician or vocational rehabilitation expert" but not by a physical therapist, who may fall within the term "rehabilitation expert" but was not a vocational expert.   In this case, the company did refer Williams and Williams's records to a physician and a vocational expert.  The fact that the company also sent her to a physical therapist does not in and of itself trouble the court, because a physical therapist could indeed provide helpful and relevant information to the disability issue.  Further, the very broad definition of physician set out in the policy would arguably cover a licensed physical therapist such as Clem.  Perhaps the policy could and should include a broader list of professionals to whom the company may send employees and expressly include physical therapists within the list.  However, the court finds no violation of the policy provisions in the company's referral of Williams to a physical therapist.

The more troubling matter is not that the company sent Williams to a physical therapist, but instead, that it ignored the physical therapist's own caveat about the need to evaluate Williams over a broader time period to obtain a more accurate view of her work tolerances.

Because the evaluator warned that the evaluation is not accurate, then any reliance on that evaluation is called into question.

For all of these reasons, the emphasis the company placed on the flawed FCE was misplaced and unreasonable.

*The Inconsistencies and Defects in the Denial Letters*

If, after once finding that an employee is totally disabled, the company is going to change its position and find no disability, common sense dictates that it should have good, strong reasons and be able to communicate those reasons in the denial letter with clear, consistent language.

In the instant case, the change from disabled to not disabled was unaccompanied by a documented change in the patient's condition. It was unaccompanied by evidence of fraud or misconduct on the part of the patient. The denial letter pointed out no such changes because no such changes occurred. Further, the denial letters were replete with mistakes, inconsistencies, and or omissions of crucial information.

The January 14, 2011 denial letter suffered from the following defects: (1) it based its decision to deny disability on the absence of "medical documentation" for a condition whose symptom is subjective pain, when the original decision finding disability had been based on no additional documentation; (2) the company relied heavily on the FCE by Todd Clem but failed to acknowledge that Clem himself called into question the validity of the FCE; (3) the company provided only one sample sedentary occupation that it claimed Williams could perform, but that occupation was in the "light" category, incorrectly labeled as "sedentary"; (4) the company

referred to a number of Dr. McLain's reports[7] that it did not have or could not read, but failed to request those reports from Dr. McLain *before* changing its position.  Dr. McLain later provided copies of the missing lab reports.

The October 13, 2011 denial letter, confirming its January 14, 2011 decision, also had defects and inconsistencies.  For example, the letter refers to both Clem's FCE *and* Dr. MacGuire's more restrictive opinion about Williams's functional work capacities, but the letter fails to reconcile the two. Then, the letter asserts that Williams can perform sedentary work based on Dr. MacGuire's opinion, a rheumatologist who never examined Williams.  The letter next refers to a transitional skills analysis performed in 2010 by a vocational counselor and implies that the analysis finding four sedentary occupations was based on and consistent with MacGuire's limitations and restrictions.[8]  However, this implication is misleading; the 2010 TSA could not have been based on MacGuire's *October 2011 opinion* because it pre-dated her opinion and was in fact based on *Clem's* less restrictive FCE.  The analysis did not, for example, factor in MacGuire's restriction regarding no activities that require "repetitive hand gripping or grasping more than once an hour."  (Doc. 20-29, at 9).  The company performed no such vocational analysis based on *MacGuire's* more restrictive opinion.

---

[7] The January of 2011 denial letter complains that Dr. McLain had not provided the following: (a) lab tests showing the positive Antinuclear Antibody Test referenced in Dr. McLain's November 24, 2009 medical chart; (b) no MRI or xray of hip to support "subjective" complaints of hip pain diagnosed as bursitis and resulting in Dr. McLain's giving Williams an anti-inflammatory injection; and (c) a legible February 2, 2009 office note (the copy the company received was illegible).

[8] In two separate places the letter mentions MacGuire's opinions about the limitations and then immediately discusses the TSA as if the TSA is based on the restrictions in MacGuire's opinions.

The court also recognizes the recurring theme in both denial letters regarding the lack of objective medical evidence. While that requirement sounds reasonable, the application in the instant case is not reasonable for several reasons. First, one of Williams's condition, fibromyalgia, is a pain-based disease, and if the court were to require objective medical evidence to support that diagnosis, no patient would ever be disabled based on that disease. Rather than require such evidence, the more reasonable approach would be to require the doctor to determine whether the patient's condition meets the criteria approved by the American College of Rheumatology. That criteria was good enough for United of Omaha to support its initial determination that Williams was totally disabled and it should be good enough now.

Second, as to the other auto-immune diseases such as rheumatoid arthritis, United of Omaha challenges the sufficiency of objective medical evidence to support them, but the objective evidence is repeatedly present in lab tests. The presence of positive ANA and RH factors, and other factors associated with auto-immune disorders, as documented in numerous lab tests, confirmed for the specialists in this area, including the Chief of Rheumatology at Brookwood Hospital, that Williams had these auto-immune disorders. United of Omaha wants more: it wants xrays and MRIs and evidence of inflammation. Sometimes the medical records provides evidence of injections for inflammations and sometimes it does not, but the waxing and waning of inflammation with auto-immune diseases is a characteristic of them.

Dr. McLain testified that his treatment regimen has not been able to do as much for Williams's fibromyalgia pain as he has been able to do for her rheumatoid arthritis inflammation. He also testified that flare-ups with the auto-immune diseases increase with increased activity. Based on this testimony, common sense dictates that when Williams decreases her activity and

does not work, her disease symptoms – both objective and subjective –  decrease. That decrease in symptoms with a decrease in activity does not mean that the disease is absent and it does not mean that she can handle full-time work.  Also based on this testimony, a decrease of rheumatoid arthritis symptoms such as arthritis-associated joint pain and inflammation does not mean that Williams is not still suffering from fibromyalgia-associated pain.  Under these circumstances, United of Omaha's unwillingness to accept the medical information provided as sufficient support for her diseases and disease symptoms is unreasonable.

The court could continue this litany but it will not.  The sloppiness and inconsistency in the denial letters is troubling as is the company's decision to ignore consistent medical testimony, lab results, and standard criteria for diagnoses.  When combined with all of the other information in the record, these defects render unreasonable the company's actions.

*Social Security Disability*

Finally, the court recognizes Williams's argument that, in terminating her benefits, United of Omaha failed to consider the Social Security Administration's approval of Williams for Social Security disability benefits when United of Omaha had actively encouraged her to pursue a disability finding.  That active encouragement would appear to be inconsistent with its current position that Williams is not disabled.

Indeed, United of Omaha's actions do not pass the smell test.  First, United of Omaha actively encouraged Williams to pursue of Social Security disability benefits, referring her to a law firm to make the claim and demanding and accepting the proceeds from a successful Social Security claim to reduce its disability payment obligations to Williams.  Next, having accepted those Social Security disability proceeds, it denied that the employee is disabled.  Both actions –

36

accepting the Social Security disability proceeds and denying that Williams is disabled – are financially advantageous to the company, but they happen to be conflicting positions.

The court recognizes that social security cases have different standards and procedures than ERISA disability cases, as the weight afforded evidence differs and the definition of disability varies between the types of disability.  Nevertheless, the circumstances here do reflect that United of Omaha has taken inconsistent positions and has accepted disability proceeds to decrease its own coffers, and the court considers that factor of conflicting positions as one of many that raise questions about the reasonableness of United of Omaha's current position that Williams is not disabled. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 118 (2008) ("[T]he court found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of benefits of her success in doing so ... and then ignored the agency's finding n concluding that Glenn could in fact do sedentary work ... This course of evens was not only an important factor in its own right (because it suggested procedural unreasonableness)).

For all of the above reasons, the court FINDS that United of Omaha's decision was *de novo* wrong *and* that it had no reasonable grounds to justify its decision.  Accordingly, the court ends the inquiry, and it will DENY United of Omaha's motion and GRANT Williams's motion, REVERSING  the decision of January 14, 2011, confirmed on October 13, 2011 that Williams is not disabled from "any occupation"; she is entitled to disability benefits.  The court will ORDER the REINSTATEMENT of disability benefits as of January 9, 2011.

The court will REMAND this matter to the Administrator, United of Omaha, to calculate the amount of benefits past due and to pay those past due benefits to Williams and to continue

paying disability benefits.

Williams has requested a reasonable attorney's fee and court costs.  Pursuant to ERISA's provisions, "the court in its discretion may allow a reasonable attorney's fee an costs of action to either party."  29 U.S.C. § 1132.  The court, in its discretion, FINDS that Williams is entitled to an award of court costs and an award of reasonable attorney's fees, and the court will DIRECT her to file a motion for attorney's fees on or before **October 21, 2013** with a response due from United of Omaha on or before **November 12, 2013.**

Williams has also requested prejudgment interest.  Although ERISA does not contain an express provision for prejudgment interest, the Eleventh Circuit has acknowledged that the "award of an amount of prejudgment interest in an ERISA case is a matter 'committed to the sound discretion of the trial court.'" *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield,* 41 F.3d 1476, 1484 (11th Cir. 1995) (quoting *Moon v. Am. Home Assurance Co.,* 888 F.2d 86, 89-90 (11th Cir. 1989)). The court FINDS that an award of prejudgment interest is appropriate in this case not only to ensure that Williams receives full redress for the wrong committed when she was denied the full use of the mon**ey** to which she was lawfully entitled but also to prevent the unjust enrichment of United of Omaha.  Accordingly, the court, in its discretion, will ORDER the administrator, United of Omaha, upon remand, to pay to Williams prejudgment interest at the rate of 6% per annum.

Williams requests postjudgment interest as well.  The court notes that Williams automatically is entitled to any postjudgment interest accruing subsequent to the entry of the judgment at the rate provided by statute.  *See* 28 U.S.C. § 1961; *U.S. S.E.C. v. Carillo,* 325 F.3d 1268, 1271 (11th Cir. 2003) ("The prevailing party ... is statutorily entitled to postjudgment

interest under 28 U.S.C. § 1961").

The court will RETAIN jurisdiction over this matter to address the following items: (1) post-judgment motions such as the motion for a reasonable attorney's fee; and (2) any subsequent request to enforce or effectuate this court's judgment and any amendments to this judgment.

Dated this 30th day of September, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE